Marshall, C. J.
 

 Dwight Harrison was indicted and tried by the court of common pleas of Franklin county for violation of Section 13175, General Code, as follows:
 

 “Whoever knowingly makes or publishes, or permits or causes to be made or published, a book, prospectus, notice, report, statement, exhibit or other publication of or concerning the affairs, financial condition or property of a corporation, joint stock association, copartnership or individual, containing a statement which is false or willfully exaggerated and intended to deceive any person as to the real value of any shares, bonds, or property or part thereof, of said corporation, joint stock association, copartnership or individual, shall be fined not less than one hundred dollars nor more than ten thousand dollars or imprisoned in the penitentiary not less than one year nor more than five years, or both.”
 

 The indictment alleges that Harrison was an officer of the R. L. Dollings Company, an Ohio corporation handling stock of certain subsidiary corporations, and that as such officer offered for sale to the general public in Franklin county the preferred stock of the Phoenix Portland Cement Company, another Ohio corporation, and a subsidiary of the R. L. Dollings Company, and that the R. L. Dollings Company, through its officers
 
 *432
 
 and agents, sold to the general public stock of said subsidiary corporation in the amount of $2,253,600.
 

 The indictment further alleges that the said Harrison, within said county and state, from the 22d of September, 1922, and at divers other times between September 22, 1922, and March 31,1923, as an officer and agent of the E. L. Bollings Company, and for the purpose of promoting the sale of the preferred stock of said subsidiary corporation, “did then and there unlawfully and knowingly make, publish, and permit, and cause to be made and published, orally and in print, certain false statements, to wit, that the Phoenix Portland Cement Company, subsidiary corporation, as aforesaid, then and there owned a certain cement manufacturing plant at Nazareth in the state of Pennsylvania, and a certain cement property at Birmingham in the state of Alabama, whereas, in truth and in fact the said the Phoenix Portland Cement Company, subsidiary corporation as aforesaid, did not then and there own a certain cement manufacturing plant at Nazareth in. the state of Pennsylvania or any cement property at Birmingham in the state of Alabama, which said statements as to the ownership of said plant and property were false and intended to deceive purchasers of said preferred stock- of said the Phoenix Portland Oement Company, subsidiary corporation as aforesaid, as to the real value of said preferred shares of stock and said statements did then and there deceive one Lena L. Shadrach as to the true value of said preferred stock,” and that thereupon she purchased a portion of said stock.
 

 
 *433
 
 The indictment contains a further count differing from the former only in omitting to allege that the statements were false, and containing the allegation that they were willfully exaggerated.
 

 The defendant was adjudged to be guilty in the trial court, the judgment was affirmed in the Court of Appeals, and a motion for leave to file petition in error in this court was allowed.
 

 The first of the legal questions presented for determination in this court relates to the taking and use on behalf of the state of the deposition of one L. C. Morton, of Philadelphia. Upon this point it is urged, first, that the statute providing the procedure for taking a deposition in a criminal case is unconstitutional, as being in violation of the Fourteenth Amendment of the federal Constitution, as being a denial of due process and the equal protection of the laws; second, that the court in ordering the deposition to be taken and in providing the procedure therefor has not followed the mandates of the statute, in that it was not made to appear that the attendance of the witness whose deposition was to be taken could not be had at the trial.
 

 Upon the first of these contentions it is sufficient to say at this time that, in the case of
 
 Morton
 
 v.
 
 State,
 
 105 Ohio St., 366, 138 N. E., 45, it was decided that an amendment to the existing statutes was attempted, and that the amendments were unconstitutional and void, and was further decided that the repealing clause of the amendment was unconstitutional, and therefore inoperative, the effect of which was to leave the original enactment as valid provisions relating to the taking
 
 *434
 
 of depositions in criminal cases. That question having- been recently decided by this court, we do not feel impelled at this time to further review the validity of that statute, but on the contrary will sustain the validity of those sections upon inferences which may be logically drawn from the second syllabus of that case.
 

 Upon the second contention it is only urged that the dissenting opinion of Wanamaker, J., in the
 
 Morton case
 
 argues that a deposition may not be talien or used unless there is a finding of the court that the witness cannot be had at the trial. While no issue was taken upon that point by other members of this court, it does not appear that the dissenting opinion had any support among the other members, and that dissenting opinion cannot therefore be a potent authority for the conclusions reached. Our answer to this proposition is that, inasmuch as it appears by the application of the prosecuting attorney that the witness whose deposition was to be taken resides out of the state of Ohio and in the state of Pennsylvania, all courts in Ohio will take judicial notice that compulsory attendance of such witness cannot be obtained in any case, civil or criminal, in the state of Ohio. It therefore sufficiently appears, not only in the application, but also in the entry of the court ordering the deposition to be taken, that the said Lindley O. Morton is a material witness in behalf of the state, and that he resides without the state.
 

 The record discloses that, when the deposition of Morton was taken in Philadelphia, counsel for Harrison appeared and cross-examined. There is
 
 *435
 
 no claim in this case that the defendant was indigent, or unable to defray the expense of going to Philadelphia in person, or of employing the services and defraying the expenses of counsel in going to Philadelphia to cross-examine the witness. If any irregularity had been shown, it is impossible that the same could be prejudicial under the circumstances. We are of the opinion, however, that the statute is constitutional, and that it was fairly complied with, and that no error is shown upon this assignment.
 

 The next assignment of error we shall consider relates to the indictment itself. Counsel filed a motion to quash and also a general demurrer challenging the sufficiency of the indictment because the accused was charged with having made a “willfully exaggerated” statement concerning certain property. This challenge reaches directly to the constitutionality of Section 13175, General Code, as to that part thereof which makes it a penal offense to make a “willfully exaggerated” statement. It is claimed that this language does not advise the defendant of “the nature and cause of the accusation against him,” as required by Section 10, Article I, of the Ohio 'Constitution, and it is also claimed that it is a denial of “due process” and “equal protection of the laws” as conferred by both state and federal Constitutions.
 

 If the accused is advised of the nature and cause of the accusation against him, it must also be held to be a compliance of due process and equal protection of the laws and we shall therefore only discuss the applicability of Section 10, Article I. A number of cases are cited, decided by the
 
 *436
 
 federal courts and by the Supreme Court of Ohio. It is not necessary to discuss any federal case, except
 
 United States
 
 v.
 
 Cohen Grocery Co.,
 
 255 U. S., 81, 41 S. Ct., 298, 65 L. Ed., 516, 14 A. L. R., 1045, that being the strongest authority for the defendant, and, if that authority does not require Section 13175 to be declared unconstitutional, then it is believed that no federal authority can have such force and effect. In that case the Supreme Court of the United States was construing Section 4 of the Lever Act of August 10, 1917, as amended by Act October 22, 1919', Section 2 (U. S. Comp. St. Aim. Supp., 1923, Section 3115-1/8ff), the pertinent provisions of which are as follows:
 

 That “ it is hereby made unlawful for any person willfully * * * to make any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries. ’ ’
 

 An indictment under that statute was quashed by the trial court, because “the law is vague, indefinite, and uncertain and because it fixes no immutable standard of guilt, but leaves such standard to the variant views of the different courts and juries which may be called on to enforce it, and because it does not inform defendant of the nature and cause of the accusation against it.”
 

 Chief Justice White, in reviewing the case, approved of the reasoning of the trial court, and proceeded to point out the conflicting results which had arisen from the efforts of different judges in administering that statute, as indicating the different standards employed by the different judges in construing the words “just and reason
 
 *437
 
 able,” and without an elaborate discussion declared that the statute was void for repugnancy, upon the following authorities:
 
 United States
 
 v.
 
 Reese,
 
 92 U. S., 214, 219, 220, 23 L. Ed., 563;
 
 United States
 
 v.
 
 Brewer,
 
 139 U. S., 278, 288, 11 S. Ct., 538, 35 L. Ed., 190;
 
 Todd
 
 v.
 
 United States,
 
 158 U. S., 278, 282, 15 Ct., 889, 39 L. Ed., 982. The opinion of the Chief Justice then briefly referred to other cases decided by that court, which were claimed to be of a, contrary tenor:
 
 Waters-Pierce Oil Co.
 
 v.
 
 Texas,
 
 212 U. S., 86;
 
 Nash
 
 v.
 
 United States,
 
 229 U. S., 373, 33 S. Ct., 780, 57 L. Ed., 1232;
 
 Fox
 
 v.
 
 Washington,
 
 236 U. S., 273, 35 S. Ct., 383, 59 L. Ed., 573;
 
 Miller
 
 v.
 
 Strahl,
 
 239 U. S., 426, 36 S. Ct., 147, 60 L. Ed., 364;
 
 Omaechevarria
 
 v.
 
 Idaho,
 
 246 U. S., 343, 38 S. Ct., 323, 62 L. Ed., 763. Those cases were distinguished by the chief justice on the ground that in the statutes or subjects with which they dealt “a standard of some sort was afforded.”
 

 It is not necessary at this time to go farther than the discussion of that case. In the Lever Act no standard of profits is established. Profits might be moderate, reasonable, excessive, or extortionate. They depend upon a great variety of elements. The statute only forbids “any unjust or unreasonable rate or charge in handling or dealing.” The justness or reasonableness of a charge depends upon the expense involved. It depends upon the hazard of the enterprise. There are so many elements to be considered that it is impossible to enumerate them,, or even conceive of all the things that may or may not occur or enter into the transaction. On the other hand,
 
 *438
 
 numerous prosecutions under the Anti-Trust Act have heen approved, where it was necessary to prove “an unreasonable restraint of trade.” It is therefore difficult to see how the anti-trust laws can be entirely free from the criticism that there is no standard whereby guilt or innocence can be measured. Without criticizing either line of federal oases, and without further effort to harmonize them, we are of the opinion that a very different situation is presented in Section 13175.
 

 An exaggeration is defined as “an undue or excessive enlargement, an amplification, an unreasonable or extravagant overstating or overdrawing in the representation of things.” The trial court defined it as follows: “Exaggeration means enlarged beyond the truth; overstated.” It will therefore be seen that, while the statute itself does not define the term, lexicographers have defined it, and the trial court has defined it as being something at variance with the truth. It is difficult therefore to see any particular reason for having used the words at all, inasmuch as the statute had already forbidden a “false” statement. It is conceivable that the Legislature intended to reach statements which might be true as to every material fact included therein, and yet, by reason of the omission of other facts known to the offender, and which ordinarily would be an essential part of a full, complete, intelligent statement, would make the same essentially false. A statement which would recite all the good points about a corporation or property, and would omit the statement of other facts which would counteract and affect the favorable statements, might be
 
 *439
 
 true as far as it goes and yet be an exaggerated statement, because of being an enlargement upon the favorable features and an extravagant overstatement of them, and not being a recital of the whole truth.
 

 Without attempting to read the legislative mind, it seems reasonably clear that an exaggerated statement must necessarily be one which conveys a false notion to some intended victim of fraud. A. careful reading of the entire statute in the light of the definitions of lexicographers, and especially in the light of the definition contained in the charge of the court in the instant case, leaves no other conclusion than that there must be either the existence or nonexistence of fact. There must be that showing of exaggeration which denotes such existence or nonexistence of fact. Section 13104, General 'Code, defines the offense of obtaining property by false pretense. Nothing is said in the statute as to the subject of the false pretense, and yet the courts have uniformly held that the false pretense must relate to a past event or an existing fact; that it is not sufficient that it have relation to future transactions. It must be more than a false promise. It must be more than the expression of an opinion. The courts have found it necessary to apply other principles, well settled in the criminal law, to that statute, and the trial courts should be equally careful in prosecutions under Section 13175, .as the trial court was in the instant case, to limit statements to those which willfully enlarge upon or overstate the truth. There is only one quality of truth, and it is not subject to relative gradations into the positive,
 
 *440
 
 comparative, and superlative. When these principles are recognized and applied as they were by the trial judge, no error can result. This court has never considered the word “exaggerated” in a criminal statute, but it has considered a more difficult problem in
 
 State
 
 v.
 
 Schaeffer,
 
 96 Ohio St., 215, 229, 230, 117 N. E., 220, L. R. A., 1918B, 945, Ann. Cas., 1918E, 1137. In that case this court had under consideration Section 12603, G-eneral Code, regulating the speed of automobiles, wherein it is required that they must not be operated “at a speed greater than is reasonable or proper, having regard for width, traffic, use, and the general and usual rules of such road or highway, or so as to endanger the property, life, or limb of any person.”
 

 This statute was upheld as not being violative of Section 10, Article I of the Constitution, by the concurrence of Nichols, C. J., Wanamaker, Newman, Jones, Matthias, and Johnson, JJ. The reasoning in the opinion of Wanamaker, J.; in that case applies with tenfold force to the ease at bar. We are asked to declare Section 13175 unconstitutional because of the employment of the term “willfully exaggerated. ” Under well-settled rules this court should only declare a statute unconstitutional if it is clearly violative of some specific provision of the Constitution. This court would have no right to amend the statute by striking out those words and leaving the remainder of the section standing, and the entire statute must therefore either stand or fall. The terms “false” ana “willfully exaggerated” are similar in meaning and must necessarily be proved by the same
 
 *441
 
 character of evidence. This indictment has been drawn in paragraphs, bnt not numbered as separate counts. No reason is perceived why the indictment could not have been materially shortened by alleging that the defendant made “a false and willfully exaggerated statement.” A similar question was recently decided by this court in
 
 Stale
 
 v.
 
 Peters, ante,
 
 249, 147 N. E., 81, in the matter of the exceptions of the prosecuting attorney in the trial of W. F. Peters, in which the construction of Section 17-1, General Code, was involved. On the principles decided in that case by the unanimous decision of this court such a statement in the instant case would have been allowed. Section 13175, therefore, does not violate any provisions of either the state or federal 'Constitutions.
 

 The next assignment of error relates to the evidence of oral statements made by the accused, and also reaches to the indictment itself, where it is charged that statements were- made ‘ ‘ orally and in print.” The language of the statute is: “makes or publishes, or permits or causes to be made or published, a book, prospectus, notice, report, statement, exhibit or other publication.”
 

 The statute makes use of a number of nouns and two verbs. Any of the nouns can be made the object of either of the two verbs. It is apparent that all of the nouns except “statement” found in this section must necessarily be written or printed documents. It is equally apparent that the word “publish” may include either oral or written matter, and that the word “statement” may likewise be either oral or written. Lexicographers define “statement” as “the act of stat
 
 *442
 
 ing, reciting, or presenting verbally or on paper.” The word “publication” is defined “notification to people at large by speech, writing, or printing.” These definitions are not controverted, but it is claimed that, by reason of the association of the “statement” with other terms, and by reason of the phrase “or other publication,” following the use of a number of words of definite meaning, all terms employed and the general phrase added thereto must all be of the same kind. It is insisted that the doctrine of
 
 'ejusdem generis
 
 applies, and that the situation is controlled by the maxim
 
 noscitur a soc¿is.
 
 We have examined the authorities cited, and it must be admitted that in some cases courts have gone to unreasonable lengths in declaring technical rules for the protection of persons accused of crimes, and we are not unmindful of the fact that criminal statutes should be construed strictly against the state and liberally in favor of the accused. They should not, however, be so construed as to destroy the plain and well-known meaning of words, neither should the construction be such as to defeat the obvious intention of the Legislature. The niceties and refinements of reasoning which have been indulged by the courts in times past are no longer looked upon with favor, and it is to be hoped that we have reached the point in the administration of criminal justice where the rights of the public will be given some consideration and innocent pei*sons be protected against the aggressions of those who are criminally inclined, and that the rules of criminal pleading and practice will not be as freely employed on behalf of accused persons as in the
 
 *443
 
 early common-law administration of criminal justice. Ve find this particular assignment of error one of little difficulty. The statute would serve no useful purpose if it merely prohibited the use of printed or written statements, and permitted those who seek to victimize credulous purchasers, to make oral false statements at will. The contention of counsel for the accused must be overruled.
 

 The next assignment of error relates to the rejection of the testimony of Hon. Chas. L. McKeehan, of Philadelphia, who at one time acted as counsel for Mr. Harrison and for the Phoenix Portland Cement 'Company of Ohio. It is claimed that this testimony was competent on behalf of the defense, for the reason that it tended to show good faith and an honest belief on the part of Harrison that the representation of ownership of the Phoenix Portland Cement Company property at Nazareth, Pennsylvania, was in the Phoenix Portland Cement Company of Ohio. The principal issue of fact in this case centers around that allegation in the indictment which alleges that it was stated that the Phoenix Portland Cement Company of Ohio, a subsidiary corporation of the B. L. Pollings Company, owned a plant at Nazareth, Pennsylvania, which statement was false and intended to deceive. If at the time that representation was made, on September 22, 1922, an agreement had been executed, which was ambiguous in its terms, and if the entire issue of fact turned upon the construction of such instrument, it is quite clear that the advice of competent counsel to the effect that the instrument conveyed title would be competent on the question of the falsity
 
 *444
 
 and the intent to deceive. We have carefully read the deposition of Judge McKeehan and find that, while Harrison and McKeehan were acquainted as early as 1919 McKeehan had not been consulted about the purchase of this property until December, 1922. From that date until after February 8, 1923, many communications passed between Harrison and McKeehan, and certain agreements were drawn and redrawn relating to the acquisition of the stock of the Phoenix Portland Cement Company of Pennsylvania. Nowhere in the deposition does it appear that Harrison sought the advice of McKeehan concerning any dealings or transactions prior to September 22, 1922, or even prior to December, 1922. Neither does it appear that McKeehan had given any advice nor rendered any opinion as to the meaning or effect of any negotiations which had taken place before McKeehan was consulted in December, 1922. All of the communications with McKeehan, and all of the opinions and advice given by him to Harrison, related to the form and effect of an agreement which was then being negotiated, and which was finally executed on February 8, 1923. It is apparent that this testimony could throw no light upon the state of mind of Harrison in September, 1922. We have been cited to the case of
 
 Ratterman, Treas.,
 
 v.
 
 Ingalls,
 
 48 Ohio St., 468, 28 N. E., 168, and, while we agree that the syllabus in that case states a sound proposition of law, we do not believe it has any application to the testimony of McKeehan which was tendered and rejected. The testimony of McKeehan was therefore not material to the good faith of Harrison in making the statement
 
 *445
 
 “that the Ohio company had taken over the Pennsylvania company,” and it was properly excluded on that ground.
 

 Another assignment of error relates to the force and effect of the agreement entered into on February 8, 1923, between the Phoenix Portland Cement Company of Ohio and the Phoenix Portland Cement Company of Pennsylvania. It is claimed by counsel for the defendant that the effect of that agreement was to give to the Ohio company such legal or equitable title to the plant at Nazareth, as well as the plant then being constructed in Alabama, as would prove the truth of Harrison’s statement that the Pennsylvania and Alabama properties had been taken over by the Ohio company. This contract was introduced in evidence by the state, and a special request to charge was made by the defendant, and refused by the court, to the effect that, if the Pennsylvania company had transferred and delivered, or had agreed to transfer and deliver, to the Ohio company, at or before the dates mentioned in the indictment, a majority of the capital stock of the Pennsylvania company, then the Ohio company held the legal title thereto and had the right to hold the same. Whether or not the refusal to charge this request was error depends upon whether there was. any evidence even tending to prove that such a transfer and delivery had been made. It is not questioned that an agreement was executed, and no issue of fact on this point could be submitted to the jury. The effect of the agreement, and whether or not it did effect a transfer and delivery of the property of the corporation, was a question of law which
 
 *446
 
 the court must determine, and that question was in fact determined when the request was refused. Many authorities from the courts, of other states have been cited by counsel to the effect that the stockholders of a corporation are the equitable and beneficial owners of the corporate property. Assuming this to be a sound proposition of law, it is not decisive of the correctness of this request to charge. It can only be decisive in the event that the agreement was one whereby the stock had been legally transferred and delivered.
 

 Whether or not the agreement did effect the transfer of ownership is a question which can only be determined by a reading of the agreement. Having carefully read this voluminous agreement, we find that it was an agreement for the purchase and sale of 66,132 shares of the capital stock of the Pennsylvania company, for an agreed price of $1,402,000, of which $202,000 was paid in cash on February 8, 1923, and the balance was agreed to be paid in 12 monthly installments of $100,000 each. The agreement contained the obligation that the Ohio company would furnish funds to complete the property in Alabama, without any definite sum being named as a limit upon such expenditures. The agreement contained the usual default clauses —that in the event any installment should remain unpaid for the period of 30 days all unpaid installments should immediately become due and payable,
 
 that! no stock would be delivered mvtil all had been fully paid for!
 
 and that upon a default the shares of stock might be sold at public auction and, after paying from the proceeds of such auction sale all bills and expenses of the Alabama
 
 *447
 
 plant, and all money remaining due upon the stock sale, the balance should be turned over to the Ohio company. As a climax to the agreement, no stock was in fact delivered to the Ohio company, but was placed in escrow under a trust agreement with the Fidelity Trust Company of Philadelphia. It is further significant that the Phoenix Company of Pennsylvania retained voting powers and retained at all times a majority of the board of directors. The agreement contained many other features, which cannot be stated in detail, but- the entire agreement may be summed up in the single statement that it was an agreement on the part of an irresponsible company to purchase a valuable property upon installment payments, the installments to be met with money to be thereafter acquired by the irresponsible party, and under an agreement containing so many obligations, conditions, and defeasances that there was a very remote probability of its ever being complied with. Later events proved that it was not in fact complied with and that the Ohio company was not able to make the payments, resulting in disaster to those who had purchased preferred stock of the Ohio company on the faith of the ownership of the Pennsylvania and Alabama plants.
 

 The issue in this case is the ownership of manu facturing plants in Pennsylvania and Alabama, on September 22, 1922. Ownership implies dominion and proprietorship. It necessarily implies the power of sale. In this case the Ohio company could not have conveyed title to any of the corporate property of the Pennsylvania company. It could
 
 *448
 
 not even have sold and transferred any portion of the capital stock which had been placed in escrow in the hands of the Fidelity Trust Company. It had nothing it could sell, except the contract itself. The dominion and proprietorship, which are an essential element of ownership, remained at all times with the- directors and officers of the Pennsylvania company, which fact is clearly shown by its retaining’ the power to vote the stock and retaining a majority of the board of directors. If it be conceded for the purposes of this discussion that the ownership of a controlling interest in the capital stock of a corporation is such equitable ownership of the property of the corporation as would support a claim of ownership of such property, it must still be answered that the Ohio company had not acquired a controlling interest in the stock of the Pennsylvania company. In the colloquy between court and counsel, during the trial, which may or may not have been in the presence of the jury, so far as the record discloses, the court repeatedly stated that, if the stock had in fact been purchased by a definite agreement, or if actual delivery had been made without any payment having been made thereon, and with, a promise of payment evidenced by a promissory note, it would be such evidence of title as would justify the statement of having “taken over” the property. It is very clear from this agreement that the stock was- never transferred or delivered.
 

 The record in this case discloses other aggravating circumstances which should be mentioned in this connection. Prior to the agreement of F'ebru
 
 *449
 
 ary 8, 1923, the salesman of the Dollings. Company had sold the preferred stock of the Ohio Phoenix Company in the sum of approximately $1,500,000. Out of the proceeds of these large sales only the sum of $202,000 was paid to the Pennsylvania Phoenix Company at the time of the execution of the contract. Subsequently thereto an additional $200,000 was paid in further partial fulfillment of that contract.
 

 The record further discloses that, after February 8, 1923, the salesmen of the Dollings Company sold additional preferred stock in the Ohio company amounting to nearly $1,000,000. By May 1, 1923, it apparently became known to the defendant that a sufficient amount of stock could not be sold to complete the purchase of the stock certificates of the Pennsylvania company, and after further negotiations the contract of February 8, 1923, was canceled, and even after cancellation the salesmen continued to circulate the prospectus and to make further sales of stock. When the agreement of February 8, 1923, was canceled, another agreement was made by way of settlement, whereby the Alabama plant was transferred to the Ohio Phoenix Company, subject to certain, conditions, including a 50-year lease to the Pennsylvania Phoenix Company.
 

 Counsel for the defendant are proceeding on the theory that a valid unconditional transfer and delivery of the stock, on February 8, 1923, would rescue the defendant from the predicament in which he placed himself by his oral statement, on September 22, 1922, supplemented by a certain printed prospectus prepared by others to his
 
 *450
 
 knowledge and which was circulated at the same time. It would be placing a great strain upon judicial interpretation of a criminal statute to permit an accused person to make a false or exaggerated statement and then overcome the effect of such false or exaggerated statement made criminal by law by thereafter acquiring property to make the statement true.
 

 It is claimed on this assignment of error that the trial court ruled in effect that the indictment would be sustained by proof on the part of the state that the Ohio company did'not have a “title of record.” We do not find anywhere in this record, and certainly do not find in the charge, that this proposition was ruled by the trial court. The court was justified in refusing this request to charge, because there was no evidence in the case tending to prove such transfer and delivery of a controlling interest in the stock of the Pennsylvania company.
 

 A further assignment of error relates to the admission in evidence, over the objection of the accused, testimony as to sales of stock made by the salesmen of the Pollings Company. The indictment contains a preliminary averment that the defendant, as an officer of the Pollings 'Company, offered to the general public for sale a large amount of the preferred stock of the Phoenix Company of Ohio, and actually sold such stock in the amount and of the par value of $2,253,600. It will be observed that Section 13175 malms no reference to actual sales of stock, but makes the offense complete upon the making of a false or willfully exaggerated statement with intent “to
 
 *451
 
 deceive any person as to the real value of the shares, bonds, or property, or part thereof of said corporation.” If we were construing- this section, uninfluenced by any of the former decisions of this court, we should hold that it was entirely unnecessary to allege or prove sales of the preferred stock of the Ohio Phoenix Company. We cannot, however, lose sight of the fact that the trial court, in ruling upon the admissibility of evidence of sales, was compelled to take into consideration as an authority the case of
 
 Coblentz
 
 v.
 
 State,
 
 84 Ohio St., 235, 95 N. E., 768. In that case the accused was being tried upon an indictment for violation of Section 7076, Revised Statutes, now Section 13104, G-eneral Code, the pertinent portion of which is as follows:
 

 “Whoever, by false pretense and with intent to defraud, * * # procures the signature of another as maker, indorser or guarantor to a bond, bill, receipt, promissory note, draft, check or other evidence of indebtedness * * * shall be imprisoned * *
 

 We find nothing in that section requiring an averment of the payment of money by the person whose signature was obtained by false pretense, and yet it was held by this court in that case that an indictment which did not allege the: ultimate payment of money in settlement of the note to which his name was signed and secured by false pretense was fatally defective. Manifestly, if it was necessary to make the allegation in the indictment, it was necessary to make proof of such payment at the trial. If the principles of that case should be applied to the instant controversy, this
 
 *452
 
 indictment would not be valid without an allegation that the sales were actually made and persons actually defrauded, and it is apparent that the state was following the principles declared in that case in drawing the indictment and in making the proof in the instant case. It may be doubted whether the decision in the
 
 Goblentz case
 
 is sound, but in any event we fail to find any prejudicial error in the inclusion of that averment in the indictment and in the making of proof at the trial. The allegation in the indictment is at most only surplusage, having no prejudicial tendency, and the proof must be regarded in the same light. We have no doubt that if the prosecuting attorney had failed to make such averment, and to offer such proof, the
 
 Coblentz case
 
 would have been used by the defendant as an authority in support of a claim of invalidity of the indictment and of failure of proof at the trial. Counsel for the state were following the safer course in adhering to the former decision of this court. Uninfluenced by the
 
 Coblentz case,
 
 we at this time hold that Section 13175 is a preventive statute, designed to prevent the fraudulent sale of shares of stock by punishing the making of any false or willfully exaggerated statement in relation to the property of such corporation. The surplus matter does no harm, and at least has the merit of presenting a case where some one has been actually wronged, and not merely making presentation of an academic question. In the charge, the court limited the application of this testimony to the question of intent, and particularly warned the jury that it did not reflect upon the guilt of the accused in having made a false or willfully exaggerated state-
 
 *453
 
 meat. It is provided in Section 13581 General Code:
 

 “An indictment shall not be invalid, and the trial, judgment or other proceeding stayed, arrested or affected * * * for surplusage or repugnant allegations when there is sufficient matter alleged to indicate the crime and person charged; or for want of averment of matter not necessary to be proved; or for other defects or imperfections which do not tend to prejudice the substantial rights of the defendant upon the merits.”
 

 In: the case of
 
 State
 
 v.
 
 Schultz,
 
 96 Ohio St., 114, 117 N. E., 30, will be found a discussion of the effect of surplusage in an indictment, which may profitably be applied to the instant case. By virtue of Section 13581, and the interpretation which has been placed upon it ini the two cases cited, we are of the opinion that there was no prejudicial error in the trial court sustaining the validity of the indictment and admitting the evidence of sales.
 

 The next assignment of error asserts that the court erred in rejecting a so-called oral contract of June 6, 1922, and also in rejecting a very large number of letters, telegrams, and other documents, which thereafter passed between the parties and which were part of the negotiations leading up to the contract of February 8, 1923, and the still later contracts of June 28, 1923. We have already discussed the subject of letters, telegrams, and other documents, in connection with the intent to deceive, and it now seems necessary to refer to them again in connection with the so-called oral contract of June, 1922. In connection with this branch of the trial the accused offered in evidence
 
 *454
 
 a telegram under date of June 6, 1922, which, was sent from Philadelphia by Lindley C. Morton to accused in Columbus, Ohio, This telegram reads in part as follows:
 

 “Mr. Walker came through nicely and everything will be satisfactory as far as Phoenix is concerned. Regarding Alabama property talked to McQueen president of Bloss Co. on the phone. He has another bidder for their property and at first would not consent to extend option at all but finally agreed to extend until July 15, provided we pay him $5,000 for option, same to apply against purchase price, if deal is consummated.”
 

 The remainder of the lengthy telegram relates to the value of the Alabama property and the desirability of acquiring it, and no part of the remainder of the telegram can by any stretch of the imagination be regarded as constituting a contract. It requires no analysis of the part quoted to show that it was not an agreement. It clearly shows that it lacked every element of an agreement. It even expressly contradicts any notion of it being an agreement. It merely refers to an option which the Pennsylvania company apparently had on some property in Alabama, and which had either then expired or was about to expire, and which could only be renewed for a short period upon the payment of $5,000. It is claimed that the rejection of this telegram was error, because it tended to prove an executed agreement to purchase. If it did so tend, even in the slightest measure, the accused was entitled to the benefit of it. That it did not so tend must be apparent, because the language of the telegram seems conclusive that the entire matter was executory and at most only
 
 *455
 
 option. It is argued at great length, by counsel, that negotiations were competent to be shown as a part of the
 
 res gestae.
 
 It must be apparent, however, that the continued negotiations are fatal to the contentions of the accused. Negotiations only continue during the executory stages of a transaction, and necessarily cease absolutely when the contract is executed. The very fact that negotiations continued for more than a "year after June 6 proves conclusively that there never was a complete meeting of the minds upon the subject of passing title until June 28, 1923, when a qualified title was acquired by the execution and delivery of a conditional deed conveying the Alabama property and at the same time relinquishing all rights under the trust agreement of February 8, 1923. We’ cannot, within the limits of this opinion, refer to each and all of the exhibits which were tendered and rejected, but it will be found that they are all of the same general character, and the same reasons already given apply to each and every exhibit so rejected. Inasmuch as they did not tend to establish either title or good faith on the part of the accused we are wholly unable to understand the theory of counsel for the state in objecting to their introduction. They would have been more valuable to the prosecution than to the defense. Their rejection could not therefore be prejudicial error.
 

 In the next assignment of error it is claimed that there was a failure of proof because the state tendered no'evidence “as to the real value of any shares, bonds, or property, or part thereof” of said corporation. This question is one of little diffieultv. No statement or representation of the
 
 *456
 
 value of the stock is charged, and evidence bearing upon its market value would throw no light upon the issue of ownership by the Ohio company of the Pennsylvania or Alabama plants. It is true that the statute refers to the real value of the shares, but this is only in the sense that the real value is affected by the truth or falsity of the statement. Whether the value of the stock is much or little is not material. The question is whether it is less than it would have been under the circumstance of truth of the statement made. It is conceivable that the stock might, by reason of extraordinary business conditions, become even more valuable subsequent to the time a false statement is made, but this would not relieve the maker of a false statement from the consequences of his act, if it is clearly shown that his statement was false and that the stock was less valuable than it would have been if the statement were true. This penal statute is concerned with those things which are usually the inducements to a purchase and the offense is complete upon the publication of the statement with deceitful intent, regardless of the profit or loss of any transaction which follows. The omission to offer evidence of real values did not therefore constitute a failure of proof.
 

 The last assignment of error which has been called to our attention, and therefore the last one which we will notice, relates to the charge of the court. It is claimed by counsel for the accused that the law was not applied to the facts, and that the jury were therefore left without definite instruction as to the law applicable to the evidence adduced. Without rehearsing the entire charge, and without attempting to analyze the charge in
 
 *457
 
 its entirety, it is sufficient to say that we have carefully examined the charge in the light of the criticism of counsel. It must be said that it is a rather brief and in many respects a meager charge, and yet it fairly measures up to the essential requirements of the duty of the court, under Section 13675, General Code, and as that section has been construed by many cases decided by this court. That duty may be simply stated .as a requirement to separately and definitely state to the jury the issues they are to try, accompanied by such instruction as to each issue as the nature of the case may require. This is the rule declared in
 
 B. & O. Rd. Co.
 
 v.
 
 Lockwood,
 
 72 Ohio St., 586, 74 N. E., 1071, and no different rule has even been declared by this court. It has, however, been declared in
 
 State
 
 v.
 
 McCoy,
 
 88 Ohio St., 447, 103 N. E., 136, and
 
 State,
 
 v.
 
 Driscoll,
 
 106 Ohio St. 33, 138 N. E., 376, that mere omission in a charge without a request on the part of counsel for further correct instruction does not constitute reversible error. Certain special requests were made before argument and were at that time refused by the court, and, while they were not renewed after argument, it was nevertheless the duty of the court to include them in the general charge if they stated sound propositions. The previous discussion in this opinion has covered some of the special requests, and only one of them is left for disposition at this time.
 

 It was requested that the court instruct the jury to disregard evidence offered by the state of certain testimony given by Harrison in a civil suit brought by Lena Shadrack against the cement company, which testimony was given in August,
 
 *458
 
 1923. Having carefully examined this evidence, we do not find it of much probative force and effect, and yet it did amount to admissions on the part of Harrison which are wholly at variance with his contentions in the criminal prosecution. He undoubtedly had the right, in giving his testimony in the civil suit, to claim his privilege, and did not do so. The evidence was of a somewhat damaging nature against him, and we know of no rule of law which protects a defendant in a criminal prosecution from admissions made by him while testifying voluntarily in a civil suit. The only other complaint of the charge which we deem it necessary to discuss was the following, which appears in the charge as given:
 

 “The court has permitted certain testimony to go to the jury regarding the making by the defendant of another false statement connected with the same transaction, with regard to a certain surplus fund. This testimony was permitted to go to you as tending to bear upon the question of intent of the defendant, and is to be considered by you solely for that purpose. It was not permitted to go to you as tending to prove guilt of the offense as charged, but solely as bearing upon the question of intent.”
 

 Two objections are urged to this matter: First, that the court erred in characterizing it as a false statement, instead of qualifying it as an alleged false statement; second, that the charge was erroneous because the testimony should have been excluded entirely and the jury charged not to regard it. These two objections will be considered in inverse order.
 

 An examination of the record shows that the
 
 *459
 
 statement relative to a surplus fund was an integral part of an address of the defendant on September 22, 1922, and the testimony adduced on this point was a part of the narration of that address by several witnesses. If this statement had been included in the indictment, no problem would be presented. Having omitted the statement from the indictment, the prosecutor was at most only entitled to have it considered as bearing upon the question of intent, and it was so limited in the charge. The practice in this state has in the past been very liberal in the admission of testimony tending to prove intent in that class of cases where intent is an essential part of the offense, and the charge on this point does not transgress or go beyond the rule heretofore established.
 

 As to the other objection, it must be admitted that the court should have characterized the statement as an alleged false statement, or by some other qualifying word. But we are unwilling to hold that that alone would constitute prejudicial reversible error. It was not a fact material to the issue, and it was not necessary to be established by the state, neither would its entire absence from the case have benefited the defense. It could only be reversible error on the theory that the province of the jury was invaded, and that the jury must have understood that they were instructed by the court that some issue, which was in fact a disputed one, was declared by the court to be beyond dispute. There was so much controversy on this point during the lengthy trial that the jury could not have so understood. We therefore find no
 
 *460
 
 reversible error either in the charge, or in the refusal to grant the further requests to charge.
 

 All of the assignments of error are therefore overruled.
 

 The situation of this case may be briefly summarized. The most difficult question in the case is the bearing of the rejected exhibits upon the question of good faith. Letters and negotiations manifesting a frantic effort to procure a contract title of some sort to the property of the Pennsylvania company are not necessarily or even logically to be taken as evidence of the good faith of claims of ownership made prior to such negotiations. They rather evidence a conviction in the mind of the accused that no such ownership then existed and the necessity of vigorous action to obtain a title of some character which would supply the earlier omission. Such' negotiations are potent evidence of an earnest effort on the part of the accused and of his purpose to redeem his former shortcomings, but do not even tend to prove that the accused did not intend to deceive, or, in other words, that he did not intend that his claims of ownership should be believed. Clearly the want of ownership and the subsequent failure of the efforts to acquire it did affect the value of the stock, because the Pennsylvania plant never was acquired and the money paid to the Pennsylvania company on account of proposed purchase Avas in large part lost. On June 28, 1923, a deed was executed for the Alabama plant, subject to a 50-year lease; the only rental being a royalty on production, Avith no guaranty of production or fixed minimum of production to secure
 
 *461
 
 payment of royalties. This qualified acquisition of the Alabama plant, on June 28, 1923, did not establish the truth of claim of ownership on September 22, 1922, and the failure at any time to acquire the Pennsylvania plant would be sufficient to prove the falsity of a material part of the statement of September 22, 1922, even though this record should- contain no evidence concerning the Alabama plant. "While we are not reviewing the weight of the evidence, our examination of this record convinces that the conviction is fully sustained by the evidence. The judgments of the lower courts must therefore be affirmed.
 

 Judgment affirmed.
 

 Matthias, Day, Allen and Kinkade, JJ., concur.