**COPLIN et al. v. UNITED STATES.***
No. 8090.

Circuit Court of Appeals, Ninth Circuit.
March 1, 1937.
Rehearing Denied March 22, 1937.

Fred Horowitz, of Los Angeles, Cal., Nat Schmulowitz, of San Francisco, Cal., Cameron Sherwood, of Walla Walla, Wash., and Hamlet P. Dodd, of Seattle, Wash., for appellants.

J. Charles Dennis, U. S. Atty., and Gerald Shucklin and F. A. Pellegrini, Asst. U. S. Attys., all of Seattle, Wash. (J. Albert Woll and Tom E. DeWolfe, Sp. Assts. to Atty. Gen., and R. E. Kline, Jr., Asst. to Gen. Counsel, Securities and Exchange Commission, of Washington, D. C., of counsel), for the United States.

Before WILBUR, GARRECHT, and HANEY, Circuit Judges.

GARRECHT, Circuit Judge.

Fifteen men, residents of California and New York, were indicted on charges of using the mails to defraud, of violating the Federal Securities Act of 1933 (section 17 (a) (2), 15 U.S.C.A. § 77q (a) (2), and of conspiring to commit the

two foregoing types of crime. The indictment contained eleven counts, one of which was dismissed. The appellants were convicted under Count IX, which charged a violation of the Security Act, and were acquitted on all other counts. All other defendants were acquitted on all counts. None of the defendants took the stand.

The indictment, including Count IX, related to the sale of the stock of the Arizona Comstock Company, a mining enterprise with properties in Nevada. None of the fifteen defendants were officers or agents of the mining company, but all were charged for their alleged acts in connection with certain selling corporations, of which they were officers, agents, managers, or salesmen.

The acts complained of began on May 20, 1933, when Ben Blue, one of the acquitted defendants, signed an underwriting contract with the Arizona Comstock corporation. The three selling agencies for the corporate stock, one of which operated in Seattle, Wash., were Alexander-Coplin & Co., of Nevada; V. E. Graham & Co., of New York; and Alexander-Coplin & Co., of Washington.

The stock was first admitted to trading on the Seattle Mining Exchange about August 1, 1933, that exchange being the one mentioned in Count IX. On other closely related dates in the summer of 1933, the stock was admitted to trading on the New York Produce Exchange and the San Francisco Mining Exchange. Customers were first reached through contact men, who interested the prospective purchasers in a securities service offered by those corporations. All such "prospects" were then sent prospectuses of the Arizona Comstock corporation, in the form prescribed by the Securities Act.

Before any advertising material was sent out to prospective customers, however, the contact men obtained lists of the marketable securities that the prospects owned. The lists later were turned over to the salesmen, who would induce the prospective buyers to turn in their other stocks in exchange for Arizona Comstock stock. This method of "high-powered salesmanship" was used in the transaction that forms the basis of Count IX, as will be shown later.

Alexander Coplin, one of the appellants herein, went to Seattle and organized Alexander-Coplin & Co. in the latter part of April, 1933. Leland Godfrey managed the office until July 1, 1933, when L. R. Coplin, the father of Alexander Coplin, took it over until September 12 of that year. Alexander Coplin then returned to Seattle from Reno, Nev., remaining in Seattle until November 20, when the office closed. Both in Reno and in Seattle, Alexander Coplin was in charge of the books and the general office work of the Coplin companies.

The appellant Serlis was in general charge of the salesmen in Reno, and was in that city most of the time, making occasional trips to Seattle, for consultation with L. R. Coplin and Alexander Coplin. It is conceded that Serlis was in Seattle on November 16, and there is evidence that he was in that city also on November 17, the date on which occurred the telephone conversation that forms the basis of Count IX.

Joseph Konwiser was one of more than a half dozen salesmen in the Seattle office, some of whom were indicted and some were not. His selling partner was Irving Snyder, one of the acquitted defendants. There was evidence that Konwiser and Snyder were the first salesmen who used the telephones in the Seattle office for calling prospective customers, from August 1 to "the middle of November." Konwiser conducted branch offices in Spokane and Vancouver, Wash., for short periods during the months of October and November, 1933. He was in Vancouver, Wash., just prior to the closing of the Seattle office, from the last week in October to about November 7. While in Vancouver, he told the switchboard operator that Serlis was "the boss."

Such was the setting in the Seattle office of Alexander-Coplin & Co. and such were the positions occupied therein by the three appellants on November 17, 1933, the date on which they are charged in Count IX with having violated the provisions of 15 U.S.C.A. § 77q (a) (2).

Section 77q reads in part as follows:

"(a) It shall be unlawful for any person in the sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

"(1) to employ any device, scheme, or artifice to defraud, or

"(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

Stripped of its formal portions, Count IX contains the following allegations: "That the said defendants, * * * being engaged in the sale of a security, to wit, the capital stock of the said Arizona Comstock Company, at Seattle, * * * on or about [November 17, 1933], did knowingly, wilfully, unlawfully and feloniously make use of a means of communication in interstate commerce, to wit, the long distance telephone between Seattle, Washington, and Astoria, Oregon, to obtain money and property by means of omission to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; that is to say, the said defendants did then and there make use of the said instrument of long distance telephone at Seattle, aforesaid, to solicit Dr. R. J. Pilkington at Astoria, Oregon, to purchase additional stock of the said Arizona Comstock Company calling attention to the rising price of the said stock on the Seattle Mining Exchange but omitting to state that the price was caused to rise by the buying and selling on the said Exchange by the said defendants themselves and the bids placed by the said defendants from day to day at gradually advancing prices; * * * " While there are 22 assignments of error, many of them can be considered in groups. We will endeavor to deal with the appellants' main propositions in logical order.

First, it is asserted that the Securities Act of 1933 (see 15 U.S.C.A. § 77a et seq.) is unconstitutional in its entirety. While the appellants state that their brief does not raise this question "directly," the fundamental nature of the proposition merits some consideration.

In the brief time that has elapsed since the Securities Act was passed, federal courts repeatedly have declared it to be constitutional, as being well within the scope of congressional authority.

In Securities and Exchange Commission v. Wickham, 12 F.Supp. 245, 246, the District Court of Minnesota held that: "The regulation of interstate traffic in securities is clearly within the scope of congressional action and an appropriate field for federal regulation."

In similar language, the act was sustained by the District Court of New York in Securities and Exchange Commission v. Jones, 12 F.Supp. 210, 213, 214: "Admittedly, the line of demarcation between what Congress may and what it may not prohibit with regard to interstate commerce is difficult to state with accuracy. From the foundation of the government the Supreme Court has struggled with the task. Nevertheless, on the decisions of our highest court—which are assembled and discussed with discrimination in Brooks v. United States, 267 U.S. 432, 45 S.Ct. 345, 69 L.Ed. 699, 37 A.L.R. 1407—I feel no hesitancy in classing the Securities Act of 1933, in so far at least as I must pass on it in the present case, as well within the power of Congress to enact."

The Jones Case was affirmed by the Circuit Court of Appeals for the Second Circuit. Jones v. Securities and Exchange Commission, 79 F.(2d) 617. The Supreme Court reversed the case on the question of the Commission's power to forbid the withdrawal of a registration statement. The court expressly refrained from expressing any views as to the constitutionality of the statute, Mr. Justice Sutherland saying: "Fourth. The foregoing disposes of the case and requires a reversal of the judgment of the lower court. In that view, it becomes unnecessary to consider the constitutional validity of the act." Id., 298 U.S. 1, 18-25, 28, 56 S.Ct. 654, 658-661, 663, 80 L.Ed. 1015.

In a case involving the same parties but different matters, the constitutionality of the act of 1933 was again attacked. The District Court referred to the fact that the Circuit Court of Appeals for the Second Circuit had held the act constitutional, and that "the Supreme Court in reversing the result did not reverse that ruling." Securities and Exchange Commission v. Jones (D.C.) 15 F.Supp. 321, 322. Similar reference was made by the Circuit Court of Appeals, in affirming the District Court's order denying a motion to suppress evidence secured from the defendant Jones, and to dismiss the suit. Id., 85 F.(2d) 17, certiorari denied, October 19, 1936, 57 S.Ct. 46, 81 L.Ed. ——.

In a well-reasoned case, United States v. Bogy, 16 F.Supp. 407, 413, the District

Court for the Western District of Tennessee, Western Division, squarely and unequivocally upheld the constitutionality of the Federal Securities Act of 1933, in its criminal provisions:

"It is settled law that the courts must leave to Congress the final determination of the policy of our national laws, the courts being concerned merely with their constitutionality and with the interpretation and application of them.

"But in what manner could Congress have manifested greater concern for the general welfare in the protection of property than in providing criminal punishment for those offenders who would use the mails and instrumentalities of interstate commerce to sell securities to the unwary, by 'device, scheme, or artifice to defraud,' or who would obtain money or property by untrue or misleading statements, or by transactions, practices, or business methods, operating as fraud or deceit upon purchasers of securities?

"The Securities Act of 1933, in its penal provisions, is plainly constitutional."

Again, in Securities and Exchange Commission v. Torr (D.C.) 15 F.Supp. 315, 319, the court said: "The power of Congress over commerce among the states is likewise a power of broad extent. The power has been exercised, validly exercised, to close the channels of interstate commerce to lottery tickets, impure food, transportation of women for immoral purposes, stolen automobiles. [Many cases cited.] It cannot be doubted that Congress may close the channels of interstate commerce likewise to such transactions in corporate securities as it has reasonably found and declared to be directly detrimental to the financial health of the public generally. To be sure, there is a limit to the control of both the mails and interstate commerce. Congress may not use either of these powers in an arbitrary manner, as to take away a right guaranteed to citizens by other provisions of the Constitution or to seize control of a matter purely local in character. [Many cases cited.] But this limit is not passed in the case of a statute that bars manipulative transactions in securities from the mails and from interstate commerce."

Both on reason and authority, we hold that, as a whole, the Federal Securities Act of 1933 is constitutional.

With greater insistence, however, the appellants maintain that 15 U.S.C.A. § 77q (a) (2), upon which Count IX is based, "is violative of the Fifth and Sixth Amendments to the Constitution of the United States in general, and specially violates the language from [of] Amendment Five 'not to be deprived of life, liberty or property without due process of law,' and that from [of] Amendment Six 'to be informed of the nature and cause of the accusation.'"

The appellants contend that the section "does not meet fair and honest standards for the legal definition of crime, because it is vague, indefinite, and fails to state an immutable standard of guilt."

While it is true that the language of section 77q uses general terms, its provisions, while perhaps falling short of the standards of immutability followed by the laws of the Medes and the Persians, are definite enough according to the canons of Anglo-American law.

Subjecting the words of section 77q (a) (2), upon which Count IX is specifically based, to critical scrutiny, we find no fatal ambiguity or indefiniteness, such as might prove a pitfall to any person, in the language of the appellants, "attempting to obey the law." No honest and reasonable citizen could have difficulty in understanding the meaning of "untrue," "material fact," "any omission to state a material fact," "in the light of the circumstances under which they were made," or "misleading." All these terms, it is true, call for interpretation in accordance to the facts of a given case. So do the terms "malice," "probable cause," "self-defense," "negligence," "fraud," "duress," "justification," and thousands of other expressions well established in the law.

Isolated from their setting, any of the foregoing terms might be said to be "indefinite" or "uncertain"; but, "in the light of the circumstances under which" they are used, their meaning is clear enough to the reasonable and well-intentioned citizen. "That is certain which may be rendered certain."

Section 77q (a) (2) forbids half-truths in the interstate sale of securities. The appellants concede that "a half-truth which amounts to deceit is a fraudulent statement."

Other objections against section 77q urged by the appellants, such as the con-

tention that the word "communications" should be construed as excluding telephone conversations, are too strained to warrant extended discussion. We have carefully considered them all, however, and find them without merit.

In Connally v. General Const. Co., 269 U.S. 385, 391, 392, 46 S.Ct. 126, 127, 70 L.Ed. 322, Mr. Justice Sutherland lucidly expounded the doctrine dealing with the degree of definiteness required of a penal statute: "But it will be enough for present purposes to say generally that the decisions of the court, upholding statutes as sufficiently certain, rested upon the conclusion that they employed words or phrases having a technical or other special meaning, well enough known to enable those within their reach to correctly apply them [cases cited], *or a well-settled common law meaning, notwithstanding an element of degree in the definition as to which estimates might differ* [cases cited], or, as broadly stated by Mr. Chief Justice White in United States v. [L.] Cohen Grocery Company, 255 U.S. 81, 92, 41 S.Ct. 298, 301, 65 L.Ed. 516, 14 A.L.R. 1045, 'that, for reasons found to .result either from the text of the statutes involved or the subjects with which they dealt, *a standard of some sort was afforded.*'" [Italics our own.]

The very phrase with which we are here especially concerned, "omitting to state material facts, under all the circumstances of the case," was discussed in Strong v. Repide, 213 U.S. 419, 430, 29 S.Ct. 521, 524, 53 L.Ed. 853. No difficulty was found with that formula:

"Thus, the deceit which avoids the contract need not be by means of misrepresentations in words. It exists where the party who obtains the consent does so by means of concealing or *omitting to state material facts, with intent to deceive,* by reason of which omission or concealment the other party was induced to give a consent which he would not otherwise have given. Article 1269. This is the rule of the common law also; but, in both cases, it is based upon the proposition that, *under all the circumstances of the case,* it was the duty of the party who obtained the consent, acting in good faith, to have disclosed the facts which he concealed. [Authorities cited.] In such cases concealment is equivalent to misrepresentation." (Italics our own.)

The appellants complain of the "subjective tests" laid down by the statute, and assert that "a man's right to liberty has always been fixed upon some objective, fixed and immutable standard to protect him from the tyranny of persecution in a thousand forms, depending upon the whim or subjective judgment of those who seek to criticise him or pass upon his actions." No less an authority than Mr. Justice Holmes, however, has pointed out that the law is full of just such "subjective. tests"; i. e., tests which the citizen is called upon to make correctly, at his peril and at the risk of having a jury subsequently disagree with his exercise of judgment— even though such "subjective" disagreement results in the citizen's forfeiting his life because of his poor judgment. In Nash v. United States, 229 U.S. 373, 377, 33 S.Ct. 780, 781, 57 L.Ed. 1232, the venerable Massachusetts jurist said: "* * * the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death. 'An act causing death may be murder, manslaughter, or misadventure according to the degree of danger attending it' by common experience in the circumstances known to the actor. 'The very meaning of the fiction of implied malice in such cases at common law was, that a man might have to answer with his life for consequences which he neither intended nor foresaw.' [Cases cited.] 'The criterion in such cases is to examine whether common social duty would, under the circumstances, have suggested a more circumspect conduct.' 1 East, P.C. 262. If a man should kill another by driving an automobile furiously into a crowd, he might be convicted of murder, however little he expected the result. [Authorities cited.] If he did no more than drive negligently through a street, he might get off with manslaughter or less. [Cases cited.] And in the last case he might be held although he himself thought that he was acting as a prudent man should. [Case cited.]" See, also, Sears, Roebuck & Co. v. Federal Trade Commission (C.C.A.7) 258 F. 307, 311, 6 A.L.R. 358; New York Cent. & H. R. R. Co. v. United States (C.C.A.1) 165 F. 833, 840, 841; Harrison v. State, 112 Ohio St. 429, 147 N.E. 650, 653.

■ Next, the appellants urge that the indictment fails to charge a crime, in that "the alleged acts of wrong doing are mere conclusions of the pleader, and do not state any fraudulent facts pointing to guilt." It is asserted that Count IX "does not charge a scheme"; that in the absence of a scheme, "the Count is a substantive charge relating to the use of a means of interstate communication, to-wit, a telephone, by which these fifteen persons obtained money and property," etc.; and that "it is apparent at once that the Indictment alleges a factual absurdity, in the absence of a scheme, as it would seem obviously impossible for fifteen persons to either communicate with one man at once by any known means of communication, or to aid and abet in so doing."

The appellants concede, however—as, indeed, they must—that, "under the Federal Statutes, a person may be charged directly as a principal or as an aider and abettor for such statutory violation"; but they insist that "an aider and abettor is not the same as a participant in either a scheme or a conspiracy."

In this connection, it should be observed that 18 U.S.C.A. § 550, provides that: "Whoever directly commits any act constituting an offense defined in any law of the United States, or aids, abets, counsels, commands, induces, or procures its commission, is a principal."

In view of this provision, we cannot see the "factual absurdity" of charging fifteen or a hundred men with making a telephone call. Ninety-nine might have "procured" the hundredth man to do the actual talking. While such procedure might be unusual, it is certainly not legally impossible, and cannot therefore affect the validity of Count IX.

As a matter of fact, however, the jury found only three of the fifteen defendants guilty under that count, so that the question of "factual absurdity," so far as the evidence is concerned, becomes moot. The question of how the three appellants "aided, abetted, counseled, commanded, induced, or procured the commission" of the offense charged, will be dealt with under its proper heading, in the discussion of the evidence supporting the verdict. Indeed, much of the appellants' argument against the indictment is in reality directed against the sufficiency of the evidence; as, for instance, where they assert that, "unless these persons were conspiring or scheming together, of which facts they were acquitted in other Counts, the evidence must directly show, which it does at no place, joint action," etc.

■ Count IX not only sets forth at some length the nature of the material omission of which the defendants were alleged to have been guilty in their telephone communication with Dr. Pilkington, but it also charges the offense in the words of the statute. It is well settled that, as a general rule, the latter mode of pleading in an indictment is of itself sufficient.

In Pounds v. United States, 171 U.S. 35, 38, 18 S.Ct. 729, 730, 43 L.Ed. 62, the court said: "The offense was purely statutory. In such case it is generally sufficient to charge the defendant with acts coming within the statutory description in the substantial words of the statute without any further expansion of the matter. [Cases cited.]"

■ It is equally well settled that: "No indictment * * * shall be deemed insufficient, nor shall the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form only, which shall not tend to the prejudice of the defendant." 18 U.S.C.A. § 556.

In Smith v. United States (C.C.A.8) 83 F.(2d) 631, 637, the court said:

" 'But even though the particularity prayed be denied, though a special demurrer be interposed and overruled, or, it would seem, a bill of particulars be requested and refused, nevertheless the judgment of conviction will not on this account be reversed if from the whole record it appears that no substantial prejudice to the defendant has resulted.' [Cases cited.]

"The overruling of demurrer or motion will not avail on error unless it appears 'that the substantial rights of the accused were prejudiced by the refusal of the court to require a more restricted or specific statement of the particular made [mode] in which the offense charged was committed.' [Cases cited.]"

Examining Count IX in its entirety, we are convinced that whatever inartificiality it may contain has not prejudiced the appellants herein. It clearly and adequately apprises them of the charge against them. They cannot demand more.

One of the propositions most elaborately argued in this case is that the evidence

does not support the verdict of conviction under Count IX. The somewhat complicated fact situation requires that we discuss this contention with some degree of fullness.

There is evidence that Konwiser was the person who actually put in the telephone call and talked with Dr. Pilkington. There is no direct testimony that Coplin and Serlis, the other two appellants, were physically present during the conversation, aiding and abetting Konwiser in perpetrating the alleged fraud upon the Astoria physician. There is, however, as we have seen, evidence from which the jury might well determine that both Coplin and Serlis were in the Seattle office on November 17, 1933, the date on which the telephone conversation was held.

Under such circumstances, it becomes necessary, first, to inquire, as a question of fact, whether there was concert of action among the three appellants; and, second, whether, as a matter of law, such concert of action, if established under a count charging a substantive offense rather than a conspiracy, would render the acts of one the acts of all.

As we read the record, there was ample evidence from which the jury could have found that concert of action existed among the three appellants. Serlis instructed the salesmen "that they could say to prospective customers that this stock would rise from its present value along with the rise in gold in this country." He told the appellant Konwiser and Snyder that they should tell people that in his opinion "the mine would be a winner." "His principal statement to the salesmen was, that the mine was good and enjoyed good management and no doubt would turn out to be a winner."

Konwiser followed the above instructions. He told one customer that Arizona Comstock stock would "double in thirty or ninety days"; that "it was a sure thing"; and that "it would be on a dividend paying basis in the near future." He said to another purchaser that "there was a dividend about to be paid"; and "that the stock would be to $6.00 or $7.00 within a very short time." He told still another customer that the stock "wasn't a speculation, it was an investment, absolutely safe"; that the stock was rising and she "had nothing to worry about"; that she should not "let the papers influ-ence" her; and that "If it was declining in the Seattle Times, not to pay any attention to it." In view of all these and other definite assurances given to customers, the jury may well have believed that Konwiser had inside knowledge of the market manipulations of his "bosses," the appellants Coplin and Serlis.

The appellant Coplin handled the buying and selling orders, the repurchase of Arizona Comstock stock from investors, the transactions with brokers on the Seattle Mining Exchange, and, eventually, customers' accounts, after such accounts had been taken in by Konwiser or some of the other salesmen. It is clear that Coplin was the organizer and the guiding spirit of the company that bore his name. When the salesmen received an order ordinarily it would be taken to Coplin.

J. S. Swenson, a post office inspector, on cross-examination by the defense testified that he was "absolutely certain that he [Serlis] did say that he well knew or was satisfied that the salesmen had made false representations, but that he should not be held responsible for them." Swenson added, however, that he did "not recall just what was said."

In view of all this evidence of co-operation among the three appellants, the jury was justified in reaching the conclusion that such concert of action extended to the telephone call to Dr. Pilkington also.

Again stressing the alleged absence of a "scheme," the appellants insist that "Count IX alone, of all the charges on trial, was a substantive charge *without reference to a scheme.*" From this, the appellants argue that "it legally follows that each defendant must be considered separately with regard to said charge, and if convicted, for himself alone in regard to the acts therein alleged either as a principal or as an aider and abettor thereunder."

That is not the law. In Cossack v. United States, 82 F.(2d) 214, 216, certiorari denied, 298 U.S. 654, 56 S.Ct. 678, 80 L.Ed. 1381, 298 U.S. 678, 56 S.Ct. 949, 80 L.Ed. 1399, rehearing denied, 298 U. S. 691, 56 S.Ct. 750, 80 L.Ed. 1409, we said:

"When it is established that persons are associated together to accomplish a crime or series of crimes, then the admis-

sions and declarations of one of such confederates concerning the common enterprise while the same is in progress are binding on the others. *It is not the name by which such a combination is known that matters, but whether such persons are working together to accomplish a common result.* '* * * The legal principle governing in cases where several are connected in an unlawful enterprise is that every act or declaration of one of those concerned in the furtherance of the original enterprise and with reference to the common object is, in contemplation of law, the act or declaration of all. * * *,' 16 C.J. § 1283, p. 646."

"The common object of persons associated for illegal purposes forms part of the res gestae, and acts done with reference to such object are admissible, though no conspiracy is charged. [Case cited.]" (Italics supplied.)

This is not new doctrine, in this circuit or elsewhere. In Belden v. United States, 223 F. 726, 730, this court stated: "It is a common thing to have the question arise whether one defendant is bound by the statements and acts of another, or of persons not even connected by indictment with the offense charged, and the constant ruling has been that, if there has been a joint contrivance, or joint participation, with a common purpose, the acts and statements of the one, while engaged in carrying into effect the common purpose, are evidence against the other, *and this without the necessity of alleging conspiracy in the commission of the offense.* [Case cited.]" (Italics our own.)

See, also, Samich v. United States (C.C.A.9) 22 F.(2d) 672, 673; Fritts v. United States (C.C.A.10) 80 F.(2d) 644, 645, 646.

We hold, therefore, that there was evidence of preconcert of action among these three appellants; that, with such foundation laid, the market manipulations of Coplin and Serlis were binding upon Konwiser; and that, conversely, Konwiser's telephone conversation with Dr. Pilkington, even if carried on without the presence of Coplin and Serlis, was binding upon the latter two appellants.

Nor does the fact that the jury found all the defendants not guilty on the conspiracy count eliminate the question of concert of action as regards Count IX, which charges each of the defendants with using the long-distance telephone to obtain money and property from Dr. Pilkington by omitting to state a material fact, etc. Verdicts on various counts of an indictment need not be consistent. This question has been so recently and so fully discussed by this court that voluminous citation of authority is unnecessary. See Macklin v. United States (C.C.A.) 79 F.(2d) 756, 758-759, and the cases there cited.

The appellants insist, however, that there is no evidence showing that even Coplin or Serlis manipulated the market, and, as a sort of corollary to the foregoing assertion, that "the stock market practices alleged as wrongful are legal and are supported as correct by all legitimate stock exchanges."

As the appellee properly points out, however, it is not important whether or not the particular market practices concealed from Dr. Pilkington were legal. The crucial question here is not the *illegality* of the practices, but their *concealment* from the customer. Such concealment was of a "material fact, necessary to make the statements made, in the light of the circumstances under which they were made, not misleading."

The record indisputably shows that from August 3, 1933, to November 17, 1933—on which latter date the telephone conversation with Dr. Pilkington was held—the price of Arizona Comstock on the Seattle Mining Exchange steadily increased, from $1.45 per share to $3.37½ per share.

The Seattle office of Alexander-Coplin & Co. was closed down on November 20, 1933, at the latest, although there is testimony that the office closed on Friday, November 17, or Saturday, November 18. At any rate, both sides agree that "from the 16th on every one knew that this office was closing."

Immediately after the office closed, the price of Arizona Comstock began to drop. On December 6, there were no bids offered, with an asked price of 50 cents a share. On December 21, there was a bid of 25 cents a share, with no stock offered for sale.

While conceding the correctness of the foregoing market quotations, the appellants contend, first, that the rise in the price of Arizona Comstock was not caused by any "unsavory and illegal methods"

on the part of the appellants, but by extraneous market conditions over which they had no control; and, second, that the subsequent decline is not shown by the record to have been caused by the fact, if it was a fact, that the appellants "actually withdrew any support from the market."

It might be illuminating, however, to ascertain from the "closing daily quotation sheets" of the Seattle Mining Exchange, precisely what happened to Arizona Comstock stock immediately after the closing of the Coplin office in Seattle.

On November 17, the day on which the conversation was had with Dr. Pilkington, the bid price of Arizona Comstock was $3.37½ and the asked price was $3.50 per share. On November 18, the probable date on which the office closed, the prices dropped to $2 and $3. On Monday, November 20, the day on which the appellants' brief states that the office was closed, the figures were $1 and $1.50. On November 21, the closing prices were $1 and $1.12½. On November 22, Arizona Comstock was quoted at 75 cents and $1.12½. Those prices held on the following day, and from then on Arizona Comstock, in the Seattle market, steadily tapered off into oblivion.

The appellants seek to explain this significantly sharp drop by the fact "that postcards were circulated through the Seattle brokerage world by a Chicago firm acting for W. D. Phelan, the President of the Arizona Comstock Company at the time, and others, offering to sell escrow receipts in Arizona Comstock stock, contrary to an escrow agreement previously entered into, the receipt of which postcards developed a widespread nervousness in Arizona Comstock's value throughout the Seattle Brokerage world."

The appellants themselves, however, refer to certain testimony that "showed the placing of the stock in escrow and its reissue to various persons from August through October, 1933." Bearing those dates in mind, one would be indeed naive to attribute to escrows the sudden tumble of Arizona Comstock during the latter part of November, 1933, immediately after the Coplin office closed!

We are not here concerned, however, with what occurred after November 17, 1933, except in so far as it might throw light upon the appellants' control of the Arizona Comstock market prior to the Pilkington telephone call. It is not necessary to assert that the decline in price was caused by the closing of the office, merely because it followed such closing.

There is ample affirmative evidence that, prior to November 17, the market practices of the appellants caused the stock of the Arizona Comstock corporation to rise on the Seattle Mining Exchange.

J. H. Roche, an accountant employed by the Bureau of Investigation of the United States Department of Justice, whose qualifications were conceded, testified that of the 201,484 shares covered by tickets in evidence showing transactions in Arizona Comstock stock on the Seattle Mining Exchange from July 31, 1933, to November 21, 1933, 161,033 shares were sold and 199,834 shares were bought for the account of Alexander-Coplin & Co. Of the 161,033 shares sold for the account of the Coplin Company, 159,733 identical shares were purchased for the account of that same company. As to these 159,733 shares, the company was "on both sides of the market."

The evidence therefore shows that Alexander-Coplin & Co. gave orders to sell 161,033 shares to certain brokers and then ordered other brokers to repurchase for it 159,733 shares of the same stock.

The appellants do not dispute the totals of Arizona Comstock shares bought and sold by Alexander-Coplin & Co., as given by Roche. They contend, however, that there is no evidence of the total number of transactions by all persons on the Seattle Mining Exchange, in connection with that stock.

In this connection, however, it should be observed that the appellee, as the appellants themselves point out, attempted to introduce in evidence all of the transactions which were had on the Seattle Mining Exchange, whether the appellants were parties to such transactions or not. The appellants objected to the introduction of such evidence, and the exhibit containing some of the data in question was stricken.

Nevertheless, there was admitted in evidence, against all defendants, a large portfolio of closing daily quotation sheets, nearly one hundred in number, containing lists of all stocks handled on the Seattle Mining Exchange and the closing prices

thereof, over a period extending from August 3, 1933, to December 30, 1933. From that exhibit, the jury could find that, during the period from August 3, to November 21, the total transactions in Arizona Comstock were 203,924 shares, of which, as we have already shown, 161,033 were sold and 199,834 shares were bought for the account of Alexander-Coplin & Co.

Indeed, W. F. Boardman, a broker, testifying for the defense, admitted on cross-examination that he gave the following testimony before the Securities and Exchange Commission:

"Q. And at that time wasn't the following question asked you, and did you not make the following answer:

"'Question. Isn't it fair to say that possibly in excess of 95% of the buying was by Coplin & Company?' and you answered, 'I would say that an overwhelming part of the buying was done by Coplin. Whether it was 85% or 90% I would not say, but most of the buying was by Coplin & Company.

"'Question. An overwhelming part?

"'Answer. Yes.'"

Boardman also testified in the court below that his recollection was he had said before the Commission that he "had no doubt but what Coplin & Co. made the market for Arizona Comstock stock."

As the appellee points out, the figures that we have quoted above left "very little room for any outside activity in the stock," and left "for the jury the question of whether or not the advance in the price was caused by the appellants themselves."

The appellee asserts that the Coplin Company was "matching orders"; that is to say, that "they would order one broker to sell a certain number of shares of Arizona Comstock stock and at the same time would order another broker to buy the same identical number of shares." The Government also contends that: "It is undisputed that during the period of operation in Seattle they continually maintained a bid in the market at advancing prices."

The appellants reply that whenever the Coplin Company offered to sell stock on the one hand and put in a bid to buy stock on the other hand, the bid to buy stock was on behalf of a customer, and in all cases there was a "beneficial change of ownership."

To rebut this defense of "beneficial change of ownership," the appellee adduced the testimony of A. J. Zimmerman, special agent for the Department of Justice, who stated that out of 149,222 shares of Arizona Comstock, 33,146 shares, or more than 22 per cent., were canceled by the customers to whom the shares were charged.

The appellee further contends that these cancellations represent "fictitious transactions"; that is to say, transactions that "were not bona fide orders for stock" emanating from customers. To support this charge, the appellee produced twenty "cancellation" witnesses, who testified on direct examination that they did not purchase the stock charged against their names on the books of Alexander-Coplin & Co., as having been purchased through brokers on the Seattle Mining Exchange. On cross-examination, most of those witnesses testified that they had had business dealings with the Coplin Company, but the vast majority of those persons did not retract their denial that they had purchased Arizona Comstock stock. Some, however, were not clear as to exactly what transactions had occurred.

A careful study of the record containing the testimony of these so-called "cancellation" witnesses leaves us in no doubt that the jury would have been justified in finding that, in most of the instances, such witnesses had not ordered the stock with which they were charged. In other words, the "transactions" were, as contended, "fictitious."

The appellants insist that "not a single broker witness produced by the government testified that any act or transaction on the part of the defendants was wrongful, nor was a single practice which was followed by them condemned"; and that, in connection with their attempt to arouse public interest through the sale of Arizona Comstock stock, "they had agreed to maintain bids and offers, according to the rule of the exchange." "If that consists in 'making the market'," the appellants continue, "then Mr. Boardman's statement is correct and that inference is all that can be fairly drawn from that statement."

Whether legitimate or illegitimate, however, the market activities were not disclosed to Dr. Pilkington during the

telephone conversation in question. Those activities were "a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." The appellants are not charged in Count IX with engaging in illegal stock market practices: they are charged with failing to disclose that the rise in the price of Arizona Comstock was due to "the buying and selling on the said Exchange by the said defendants themselves and the bids placed by the said defendants from day to day at gradually advancing prices."

Appellants argue that the buying and selling in the Exchange had nothing to do with the rise or fall of prices which may be attributed to other causes. Although it was not necessary, but out of abundance of caution, the Government offered the testimony of a number of mining experts, relative to the actual value of the various mines owned and operated by the Arizona Comstock Corporation, during a period extending from 1924 to 1935 to show that there was no material factor to justify such advance in stock prices.

Succinctly stated, this testimony was to the effect that during the so-called "Comstock merger operation on the Comstock lode," from 1924 to 1926, including work on four mines owned by the Arizona Comstock Corporation, $5,000,000 was spent on the whole lode, and about $750,-000 was lost in the operation; that at the time the operation closed, it was not believed that the ore would keep the large Comstock mill busy, nor was it deemed advisable to build a small mill "to work out this block of ground"; that the Comstock Merger was closed because it could not be conducted at a profit, although the loss per ton was comparatively small; that the Comstock mine, in 1935, would have required the expenditure of about $300,000 to put it "into practical operation, providing the development work showed sufficient ore to justify the operation."

█ With regard to the foregoing testimony, as well as much of the other evidence discussed by the appellants, it should be borne in mind that the question of weight and credibility is for the jury and not for the court.

█ Finally, the appellants assert that the court below erred in permitting the jury to consider the testimony as to the telephone conversation of Konwiser with Dr. Pilkington.

First, it is argued that Dr. Pilkington did not state that the conversation to which he testified "was *all* of the conversation had by him," and that therefore "no proof can be said to exist that anything was omitted from that conversation."

We believe the foregoing objection to be without merit. Counsel for the appellee emphatically requested Dr. Pilkington to relate the entire conversation: "Q. And what conversation did you have on that phone call? Tell us the details as far as you are able to recall, what was said to you, everything, and what you said on this phone call." A few minutes later, Dr. Pilkington himself stated: "I had no other conversation in relation to Arizona Comstock over the long distance telephone on November 17th."

The appellants complain that Dr. Pilkington was not "thereafter" asked whether that was all of the conversation. We cannot see how again referring to the subject of completeness would be anything other than repetition. If the appellants had any doubt whether Dr. Pilkington related the entire conversation, they could have developed that fact during cross-examination. This they failed to do. In any event, the matter of Dr. Pilkington's memory or truthfulness was a matter for the jury to determine, and did not go to the admissibility of his testimony.

Second, it is contended that there was "no identification of the person telephoning." For the proper discussion of this point, as well as for the proper understanding of the sales methods used upon Dr. Pilkington, it is necessary to consider somewhat fully the testimony of some of the so-called "telephone witnesses."

Le Moine Evans testified that she had been employed by the Coplin Company for three weeks in 1933 as a telephone operator before the office closed. While there was undoubtedly some confusion in her testimony, at least part of that confusion may be attributed to the fact that, at the time she put in the call to Dr. Pilkington, two salesmen—one of them Konwiser—were shouting orders to her, according to the record.

Excerpts from the testimony of Miss Evans linking Konwiser with the telephone

conversation with Dr. Pilkington are given below:

"Q. Do you know on that occasion whether or not Mr. Konwiser talked to Dr. Pilkington over the telephone? A. Yes, I am positive that he was the man that talked on the phone. He asked me to stand by the door and not let anybody else in while he was talking. * * *

"He was standing right by my switchboard and he told me to place the call, and I told him I couldn't place the long distance call over that board and he demanded that I should do it. * * * I am sure it was Mr. Konwiser. * * *

"I remember very definitely that it was both Mr. Snyder and Mr. Konwiser were shouting calls at me, but I do know that Mr. Konwiser was the man that talked on the call because he was the only man left in the office. * * *

"I knew it was Mr. Konwiser, I could hear them talking to him. I took his name when I took the call. We were supposed to take the name of the salesman on every long distance call. I did that in the first week and a half I worked on the long distance board. The local board was supposed to handle local calls exclusively on an unlisted number. * * *

"Mr. Konwiser was talking in the private office right off of the office where I was, a private room. I was standing at the door when he was talking. There were two doors which were both closed. He told me that he didn't want anybody in. He didn't want to be interrupted. I knew there was something wrong. I knew the office was going to close. * * *

"Both Mr. Konwiser and Mr. Snyder were in there, and they were both shouting calls at me. And I wasn't sure who was going to talk over the telephone to this Dr. Pilkington at the time. * * * But when they finally talked on it Mr. Konwiser was the man that talked on the call. * * *

"Well, I remember that call because I wasn't supposed to have any long distance calls over my board, and I wanted him to go to the other part of the office to have his long distance call and he wouldn't do it. He demanded that I should have his long distance call, and I told him I wasn't supposed to. * * *

"I had another reason to remember because I wanted to call him and tell him

to 'lay off', that is, Dr. Pilkington. The same voice that called from Vancouver and talked to Alexander Coplin and gave the name of Konwiser was the same voice that talked to Dr. Pilkington."

We believe that the foregoing was sufficient testimony to go to the jury, with reference to the appellant Konwiser's connection with the telephone call to Dr. Pilkington.

This same question of the identification of the telephone call was again brought up by the appellants in their motion for a new trial, in support of which motion there were submitted affidavits by some of the acquitted defendants. Irving Snyder deposed that it was he who talked to the Astoria doctor; Samuel Norman Gordon swore that he personally placed the call for Snyder, and heard the latter carry on a conversation with Dr. Pilkington; and Victor E. Graham recited that, in a Seattle hotel on November 1, 1935, Le Moine Evans told him that she could not tell who made the call, "as they all used the firm name of Alexander Coplin."

We confess that we are not impressed with this eleventh-hour showing on behalf of Konwiser. The attempt is made to explain these affidavits as having been made necessary by the fact that "these witnesses could not have testified unless they took the stand in their own defense," which they elected not to do. They were, of course, quite within their rights in making that election. Their privilege to remain silent during the trial, however, was a shield and not a sword; the defendants can hardly use such silence as a basis for overturning the verdict of the jury.

We are not here dealing with newly discovered evidence. The affiants knew the alleged facts at the time the trial commenced. They chose to stay off the stand, and to take the chances of an acquittal without having to testify. After the verdict was returned, they suddenly became active on behalf of one of the convicted defendants. Such procedure is not calculated to move an appellate court to set aside an order denying a motion for a new trial. It is elementary that such a motion is a matter addressed to the sound discretion of the lower court.

The Astoria physician testified in great detail as to the telephone conversation itself:

"He said, 'This is Mr. Alexander Coplin of the Alexander Coplin Company. I am talking from Seattle. How are you, Doctor? I have some wonderful news for you.' And I said, 'Yes, what is it?' He said, 'I have some private, confidential, very confidential information that there is to be a very large dividend declared on Arizona Comstock next Friday, a week from today.' And he said, 'We are calling up some of our good customers and we want you to get in on this.' I said, 'I will think it over.' 'No,' he said, 'this thing is going to get out, and there's going to be a rush, and I want you to get in on it. This morning it opened at 3⅛. It is now 3½. It is going to go up very rapidly. By the Monday following I am certain it will be 6½ on the New York Exchange.' He said there was a block of stock I could get for 3⅜ yet.

"I said, 'Mr. Coplin, if it is such a good stock, why don't you get it for yourself?' He said, 'We are in for every cent we can get and our friends are in, and I wish you to get in.' I said, 'Where do you come in on that?' He said, 'You are going to get a good thing. We are kind of depending on our friends to look after us on this thing.' I said, 'Mr. Coplin, I have some stock.' He said, 'You have got this stock and you should sell it out. You have some government bonds, you have some cash.' I said, 'Very little, and I am going to hang on to it.' He said, 'I would put it in. Get some more, borrow it, get it any way you can, and tell your friends.' I said, 'Well, I don't know about this. I am going to hold on to my cash anyway. I want a little nest egg.' He said, 'You have some J. C. Penney stock.' I said, 'Yes, the best stock I ever had and I am going to hold on to it.' He said, 'You have some Pacific Power & Light.' I said, 'Well, very little of it. I am surgeon for that company, and they might not like it if I sold out that stock.' He said, 'I don't blame you on that. You have got some Southern Pacific Stock.' I said—'it is not mine. I am holding it in trust.' He said, 'You have some Washington Water Power stock.' I said, 'Yes.' He said, 'Sell that.' I said, 'Look here, Mr. Coplin, I don't know you, and I want to think this over.' He said, 'Oh, doctor, I am sorry. I am sorry you said that. I have been sixteen years in this business. I will tell you what I am going to do. I will take personal charge of your account. I am going to see that you will have confidence in a man who has been in business like this. I haven't had my honor impugned at all.' I said, 'All right, I will take 500 shares, provided you can get it for 3⅜. I will use the Washington Water & Power stock, that is 42 shares, sell enough of that only to buy this 500 shares of stock. There will be a balance. Don't sell that, because it is good stock, and I hate to let it go at all.' He said, 'You are going to make so much money on this stock you can buy this back in two or three weeks anyway.' I said, 'All right, just sell enough.' I sent them the 42 shares."

Properly to evaluate this interesting piece of salesmanship, it should be borne in mind that, on the eve of the closing of the Seattle office of the Coplin Company, which had done "an overwhelming part of the buying" of Arizona Comstock, and had "made the market" for it, Dr. Pilkington was being urged, under the guise of "friendship," to gather all his cash, and borrow more—"get it any way you can"—so that he might sink it in doomed stock.

The appellants themselves point out that: "It therefore appears from all the office employees and salesmen who testified, that from the 16th on, everyone knew that this office was closing." Yet on the 17th, a representative of that office tried to stampede Dr. Pilkington into squandering his "nest egg" upon Arizona Comstock, and did, in the end, persuade the physician to turn in good securities in order to buy 500 shares of worthless stock.

It required no financial seership to realize that after the Coplin Company, which had supported Arizona Comstock in the State of Washington, closed its Seattle office, the stock would crash—as it did.

The Coplin Company did indeed close its doors—but not before that brilliant piece of high-pressure salesmanship had been executed upon a trusting customer. This final flourish, with which the concern closed its meteoric career in Seattle, was delivered by one of its representatives who, when the lamb pleaded for a little more time before being led to the slaughter, professed "injured innocence": "Oh, Doctor, I am sorry. I am sorry you said that!"

In Levine v. United States, 79 F.(2d) 364, 370, we expressed our views regarding "studied acts and conduct of the defendants to enhance the price of the stock": "Appellants assign as error the giving of the following instruction: 'Belief in the advance of the selling price of the stock, alone, is not sufficient to support good faith when the selling price is based upon studied acts and conduct of the defendants to enhance the price of the stock by the creation of an atmosphere inspiring fictitious values for the purpose of inducing people to purchase stock which plainly would not otherwise be made, by knowingly making representations of sales on the stock exchange at advanced prices when such prices were fixed by the defendants and not upon intrinsic worth or discovered value in the mine or belief of new discoveries in the mine.' This was a correct statement of the law (Harris v. United States [C.C. A.] 48 F.(2d) 771, 781), and was amply warranted by the evidence in this case. The evidence establishes that the stock here in question was worthless, and that its selling price was fixed by the defendants and based, not upon worth or value, actual or prospective, but upon 'studied acts and conduct of the defendants,' such as are described in the instruction."

See, also, Harris v. United States (C. C.A.9) 48 F.(2d) 771, 781; United States v. Brown (C.C.A.2) 79 F.(2d) 321, 325, 326, certiorari denied, McCarthy v. U.S., 296 U.S. 650, 56 S.Ct. 309, 80 L.Ed. 462.

■ Accordingly, we hold that the court below committed no error when it denied the appellants' motions for a directed verdict.

Other assignments of error deal with the admission of certain evidence, chiefly documentary, and also with certain instructions given by the court below. These objections, most of them of a highly technical nature, can be disposed of briefly.

■ First, the appellants contend that the trial court erred in admitting into evidence a large box of several hundred long-distance telephone toll tickets. The testimony relating to those tickets was given by E. C. Collier, chief special agent for the telephone company in Seattle. He identified them as original records of the company, relating to long distance telephone calls from the Coplin concern. He testified that they had been in his custody since about January 19, 1934; that previously to that time had been in the telephone company's vault; and that no one had authority to remove them from there for purposes of identification other than in the regular course of business, without a subpœna served upon him personally or upon some one that he would designate to accept it. The tickets covered the period from September, 1933, to a little after the middle of November, 1933, and one of them was for the call to Dr. Pilkington.

The appellants concede that this large box of tickets might be admissible "possibly for the limited purpose of showing a practice of system of long distance calls originating at some given telephone number"; but it is complained that "when any particular telephone call is taken from this box to establish that call as a fact, there must be the same knowledge on the part of the person who introduces it, as a document showing the call, as would be required of any other written instrument or record introduced by a witness." It is especially objected that the Pilkington toll ticket was not connected up with Konwiser, etc.

There was other substantial evidence of the Pilkington call, and of Konwiser's connection with it. We have already set out the testimony somewhat extensively, when dealing with the witnesses Pilkington and Evans. Moreover, Eleanor Gooch, long-distance telephone operator for the Coplin Company, testified that she "remembered putting in a call to a Doctor Pilkington somewhere in Oregon," "on Friday afternoon," the day before she left and "the day before the office closed." She further stated that she left on November 18, 1933.

With regard to the objection that the witness through whom the tickets were introduced lacked the requisite "personal knowledge of any of the facts relative to any particular call," it should be pointed out that Mr. Collier was the responsible officer in charge of those records. In Jennings v. United States (C.C.A.5) 73 F.(2d) 470, 473, the court said:

"We think, too, that the weekly earnings card was properly admitted over the objections urged against it. It was certainly relevant. One of the most illuminating pieces of evidence, not only in this case, but in all cases of this kind, is the plaintiff's actual work record. The week-

ly earnings card objected to was a part of his work record with the Dalton Company. Neither are we in doubt that it was properly accredited and proven up. It came from the proper custody; it was vouched for by the employment manager having charge of all the company's work records. It was not necessary to produce or account for the person or persons who had made the notations in the absence of some proof throwing suspicion upon the genuineness of the record itself.

."It is undisputed that the records from which these cards came were kept as a part of the ordinary routine of the employment department of a large business employing many men. It is also undisputed that these card records offered in evidence, like the cards of all the other employees, were made, gathered, and retained in the files in connection with, and as part of, the routine business of the company. These particular cards were offered in evidence by the manager of that department, the custodian of its records. To require more prima facie proof for their accrediting than was furnished in this case is inconsistent with the proper understanding of modern methods of doing business, and therefore of legal common sense. Rules of evidence are to aid, not to obstruct, trials; they must be, they are, so applied. It was well within the sound discretion of the trial judge to accept and admit the proffered evidence. [Cases cited.]"

See, also, United States v. Cotter (C. C.A.2) 60 F.(2d) 689, 693, certiorari denied 287 U.S. 666, 53 S.Ct. 291, 77 L.Ed. 575; United States v. Becker (C.C.A.2) 62 F. (2d) 1007, 1010.

■ Furthermore, in view of all the testimony, the evidence furnished by the toll tickets was merely cumulative, and could not possibly have prejudiced the appellants.

■ Next, it is contended that the lower court erred in admitting a check drawn by Dr. Pilkington in favor of the Coplin Company, for $656, and dated Astoria, Or., October 30, 1933. The check was indorsed to the Canadian Bank of Commerce, of Seattle, and went through the First National Bank of Seattle on October 31, 1933, to the Federal Reserve Bank of Portland, Or., according to the testimony of Orville J. Jelleberg, assistant auditor of the First National Bank of Seattle. The appellants assert that there was no proper foundation laid for the introduction of this check; that there was no showing that any of the defendants placed, or caused to be placed, the letter of its transmittal into the Seattle post office; and that the check constituted hearsay.

As the appellants themselves pointed out in the court below and in their brief here, the check in question is the one described in Count IV of the indictment, on which count all the defendants were acquitted. The defendants objected to its introduction on the ground that there was no showing that any of them had mailed the check, but, when the court overruled that objection, they did not ask that the jury's consideration of the check should be limited to Count IV and disregarded as to Count IX. The two counts relate to the same parties but to different transactions.

The appellants now complain that all the indorsements are stamped, intimating that the indorsements should have been handwritten to bind any of the defendants. But no request was made in the court below that if the check was admitted at all, the jury should be instructed to regard only that portion of the check which was handwritten, and to disregard the stamped portion.

The date of the check itself, as well as Dr. Pilkington's testimony, shows that it was paid for a purchase of stock made nearly three weeks before the telephone conversation of November 17. Dr. Pilkington stated that he bought 200 shares of Arizona Comstock at $3.25 a share, or a total of $650. The additional $6 represented the broker's commission. An exhibit introduced by the appellants themselves bears this out.

The court correctly instructed the jury regarding Count IV, telling them that it, among others, set out a specific act of mailing in furtherance of the scheme to defraud. The court stated that, before the jury could find that a separate offense against the mail fraud statute had been committed, it must find that there was the particular scheme to defraud alleged in the indictment; second, that each particular defendant intended that there should be a scheme to defraud; and, third, that the mails were used in furtherance of such a scheme. Moreover, as will be more fully set forth hereafter, the court instructed the jury that the mere

fact that some of the defendants received checks was not of itself evidence of guilt.

The appellants, however, insist that the check is prejudicial when applied to Count IX, "because it shows another substantive relationship by which the jury *may* have been influenced into attaching greater credence to Dr. Pilkington's testimony than they otherwise *might*," and that "it *might* even go so far as to establish in their minds another instance of law violation through its merely having been admitted." (Italics our own.)

To indulge in any of these suppositions is to assume both that the jury disregarded the dates of the two separate and distinct transactions and that it disregarded the clear instructions of the court below. To conjure up these hobgoblins of doubt, however, is far from pointing out prejudicial error.

 Other assignments of error relate to the admission of more than 1,000 tickets covering transactions made on the floor of the Seattle Mining Exchange in 1933 with reference to Arizona Comstock stock, and to the admission of certain books and other records of the Seattle brokers. The foregoing exhibits were by the court limited in their evidentiary effect to the appellants Alexander S. Coplin and Ben F. Serlis, and to the acquitted defendant L. R. Coplin. In other words, they were not admitted against the appellant Konwiser, the salesman.

The appellants assert that the above-mentioned limitation of the evidentiary effect of the brokers' tickets "seems to be an attempt" to follow the doctrine of Wilkes v. United States (C.C.A.9) 80 F.(2d) 285, 290, which laid down the general rule that, "before the books of a corporation can be received in evidence against a defendant other than the corporation itself, the entries therein must be shown to have been made by persons having knowledge of the facts," etc. The same decision, however, recognized an exception to the rule "where the corporation whose books are offered in evidence is shown to have been dominated and controlled by the defendant against whom they are offered."

The appellants object that the exception applies only to the books of *the corporation,* and not to outside records.

In our view, however, neither the rule nor the exception discussed in the Wilkes case is here applicable. We are not now dealing with the books of the corporation that the appellants Coplin and Serlis controlled, but with the records of the Seattle Mining Exchange. The tickets were properly identified by the employee of the Mining Exchange who handled them, by the selling brokers who made them up, and by the buying brokers who signed them. The other records of the brokers were likewise properly identified. The appellants concede that Alexander Coplin handled the transactions with the various brokers; that Serlis went to Seattle "for consultations regarding the management"; that when he was in Seattle Serlis "spent most of his time in consultation with L. R. Coplin and Alexander Coplin"; and that Alexander Coplin and Serlis were "principals" in the affairs of the company. There is evidence that Serlis claimed to be the head of the Coplin offices in Seattle, Reno, and San Francisco.

Accordingly, we hold that the admission of the brokers' tickets and records as against Coplin and Serlis was proper.

 Similarly, the quotation sheets of the Seattle Mining Exchange, already referred to herein, were admissible against all three appellants. They were identified by the employee of the Exchange who compiled them, "right from the board."

In Virginia v. West Virginia, 238 U. S. 202, 212, 35 S.Ct. 795, 800, 59 L.Ed. 1272, Mr. Justice (now Mr. Chief Justice) Hughes said: "It is unquestioned that, in proving the fact of market value, accredited price-current lists and market reports, including those published in trade journals or newspapers which are accepted as trustworthy, are admissible in evidence. [Many cases cited.]"

 The appellants also assert that the court erred in admitting into evidence certain sheets of "customers' lists," of all the investors that had purchased Arizona Comstock stock out of the Seattle office of the Coplin Company. This exhibit was introduced through J. S. Swenson, a post office inspector who testified that it was handed to him by George E. Crockett, in charge of the Coplin Company's books at Seattle and Reno. Swenson testified that the appellant Serlis "said he would ask his accountant Crockett to bring the books to Seattle from Reno to make up such a list," and that a week later, Serlis called again "and said I could depend on the

work of Mr. Crockett." The exhibit was admitted against Serlis only.

It is objected that these lists "constituted hearsay as to the defendant Serlis"; that they were summaries from other records not in evidence; that there was no foundation laid; and that they were not the best evidence.

The record, however, plainly shows that Serlis authorized Crockett to prepare the lists, and vouched for the latter's work. The subject of summaries will be dealt with under a separate heading.

There was no error in admitting these lists against Serlis.

■ The appellants also contend that the court erred in permitting the introduction into evidence of a large box containing miscellaneous papers, such as confirmations, receipts, canceled checks, bank accounts, duplicate slips, and other items from the Seattle and Reno offices. It is complained that there was no showing as to just what the papers were, and that, "They remained throughout the trial in a hopeless mess, and their only ·possible purpose could have been to create inferential prejudice against the defendants, for they were used for no other purpose."

At the·trial, the objection was made regarding the exhibit in question, "that each and every item is entered in the books" of the Coplin Company. In view of the fact that the company's Seattle books were admitted into evidence, it is difficult to see how the appellants were harmed by this exhibit. They have failed to show any basis for their charge of "inferential prejudice."

■ Next, the appellants attack the admissibility of the summaries of the Seattle brokers' transactions, of the Seattle Mining Exchange tickets, and of the Seattle books and records of the Coplin Company, contained in the testimony of Government accountants. The specific objection is that these summaries should have been limited as being admissible against only the appellants Coplin and Serlis, in the same manner as had been done regarding the summarized records themselves.

It should be observed, however, that the trial court instructed the jury that "any evidence of a summary will be limited in the same manner which the tickets themselves were," and that, "before any entry in such books can be considered by you in determining the guilt of any defendant, it must first be proven to you beyond all reasonable doubt that such defendant made or caused to be made that particular entry, or that it was made with his knowledge and under his supervision." Emphasizing this point, the court continued: "Unless you so find, no entry in the books of account can be considered by you *in any manner* as proving or tending to prove the guilt of any defendant." (Italics our own.)

The appellants complain that "in the maze of cross testimony the summaries of the various offices were so intermingled by this general ruling of the Court allowing all summaries to come in based on the memory of the jury as to whom the books were limited to, that it operated to the prejudice of the three above mentioned [L. R. Coplin, Alexander S. Coplin, and Ben F. Serlis] as well." This is tantamount to saying that the jury disregarded the emphatic instruction of the court. Prejudicial error cannot be claimed on any such showing as that.

While it is true that the court, at the time one of the accountants was summarizing the Coplin Company's Seattle books, declined to limit the testimony to the three defendants named above, whatever technical error existed in such ruling was cured by the general instructions to which we have already referred.

Regarding such summaries in general, in Lewis v. United States, 38 F.(2d) 406, 411, this court said: "The government introduced the books of the company, and documentary evidence from the files and records of the company, and called J. R. Espinosa, an expert accountant, to explain the significance of these records to the court and jury. The appellants objected to the introduction of these books and records and to certain questions propounded to the expert witness concerning these accounts. These books were very voluminous, and with the documents introduced as exhibits numbered 581 in all. The accounts were extremely complicated, owing to the range, variety, and number of transactions. One of the principal objections to the expert's deductions from the books and records is that his statements were conclusions, and therefore inadmissible, but the reason for utilizing an expert accountant is that he may explain the technical significance of the account books, that is, of the nature and character of the entries, whether debit and cred-

it, etc., and to deduce therefrom whether the books do or do not show certain facts in issue. In the strict sense of the term, he does not testify at all, except as to the accuracy and good faith of his deductions. He fills the same function as an adding machine, or a mechanical computer. He states conclusions, but they are, or should be, merely interpretive of accounts and matters in evidence which are subject to interpretation by others as well as himself, and which the jury may also interpret in accordance with or at variance with his view." See, also, Harris v. United States (C.C.A.9) 48 F.(2d) 771, 777.

The admission of the summaries made by the Government accountants in the instant case did not constitute prejudicial error against the appellant Konwiser.

■ One of the assignments of error deal with the admission of certain brokers' checks. Here again it is objected that, while the books were limited to particular defendants, these checks were admitted generally, without proof of their signed and stamped endorsements.

The checks concern financial transactions in connection with the appellants' distribution of Arizona Comstock stock. They were identified by persons having a direct knowledge of the transactions.

In connection with the evidence dealing with checks, in its instructions to the jury the court said: "You are instructed that checks from various persons to some of the defendants or checks from some of the defendants to other of the defendants unexplained by evidence on the part of the Government shall not and must not be considered by you as attaching any guilt or liability on the part of the defendant or defendants receiving or giving any such checks. Nor was there any duty resting upon the part of any defendant in this case to explain any of said checks."

In view of the foregoing instruction, which was liberally in favor of the appellants, we find no reversible error in the admission of the brokers' checks.

In connection with all the foregoing questions of admissibility, it should be borne in mind that, under the facts of this case, there has been no showing of prejudicial error resulting from the reception of the evidence referred to in the assignments of error. In Luke v. United States (C.C.A.5) 84 F.(2d) 711, 716, 717, the court said: "Under the record in this case, showing the complete wreckage of the corporation, and that a condition existed when the soliciting advertisements were sent out which made their sending unfair and untrue, the burden is upon appellant to show, in the clearest way, that there was not only error in admitting the evidence he complains of, but prejudice, in that, without this evidence, a conviction could not have been obtained. We think there was ample evidence of the condition of the company at the time the documents were sent out, and of appellant's relation to it, especially in view of his failure to explain the sources of the large sums the books gave him credit for, and of his use of the company to borrow for himself and his friends, to justify the conviction without regard to these sheets. While, therefore, we believe that the evidence was properly admitted, and that there was no error in receiving it, we think it equally plain that if there was error, no prejudice from its reception, requiring reversal, is shown." See, also, 28 U.S.C.A. § 391.

■ Finally, the appellants assert error in the instructions of the court with reference to Count IX. Counsel do not deny that they failed to note an exception to these instructions before the jury left the box, in order that the court might correct any erroneous statement it had made. It is contended, however, that the instructions in question constitute "plain error" that an appellate court may review without proper exception having been taken.

The instruction complained of was as follows:

"The ninth count of the Indictment charges a violation of the National Securities Act of 1933. It charges that the defendants made use of a means of interstate communication, to-wit: the long-distance telephone between Seattle, Washington, and Astoria, Oregon, for the purpose of obtaining money and property from Dr. R. J. Pilkington at the latter point, by deception and fraud by obtaining from him a subscription for Arizona Comstock stock; that is to say, this count charges the defendants with deceiving Dr. Pilkington through the use of the long distance telephone into subscribing for this stock by calling his attention to the rising price of the stock without advis-

672

ing him of the fact that the defendants themselves were causing the price to rise on the Seattle mining exchange.

"The National Securities law prohibits the use of a means of interstate communication, whether it be the mails or telephone or telegraph, for the purpose of obtaining money and property from another by deception and fraud and by concealing facts which the investor is entitled to have made known to him in order that the representations made to him be not misleading.

"It is for you, members of the jury, to find from the evidence beyond a reasonable doubt whether there was such an act committed by the defendants, or any of them, in violation of the National Securities Act, as alleged in the ninth count of the indictment. And it is for you to determine both whether an interstate telephone call to Dr. Pilkington was placed or caused to be placed by the defendant Konwiser or any of the defendants on trial, as charged, and whether the misrepresentations were made in that call as alleged in Count IX of the Indictment."

Without entering into a discussion of each of the objections made by the appellants to the above instructions, we may say that, when read in connection with the statute upon which the count was based, and in connection with the evidence appearing in the record, we find no substantial error in the language used by the court below. Especially do we find no "plain error" that would, in the absence of a proper and timely exception, require correction by this court. United States v. Brown (C.C.A.2) 79 F.(2d) 321, 326, certiorari denied, McCarthy v. U. S., 296 U.S. 650, 56 S.Ct. 309, 80 L.Ed. 462.

Other points presented by the appellants do not make a showing of reversible error, and are so obviously without merit as to require no detailed discussion. We have, however, considered them all, and find that they fail to establish that the appellants did not receive a fair trial.

In Lewis v. United States, supra, 38 F.(2d) 406, at pages 410, 411, this court said: "It is necessary to consider these questions, notwithstanding the abundant proof of fraud, to ascertain whether or not there is any error which affects the substantial rights of the appellants, as only in that event is a reversal of the judgment justified or permitted. 28 U.S.C.A. § 391.

Reversal will not result from error, unless from the whole record it appears to have been prejudicial. [Many cases cited.]"

Similarly, in the instant case, a scrutiny of the record convinces us that it contains no "error which affects the substantial rights of the appellants." On such a showing, it would be a miscarriage of justice if this court were to disturb the verdict and judgment of the forum below.

Accordingly, the judgment is affirmed.